# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| In the Matter of the Detention of: | No. 59371-8-II |
|---|---|
| J.A., | |
| | UNPUBLISHED OPINION |
| Appellant. | |

CHE, J. — JA appeals the superior court's denial of his motion to revise the commissioner's 180-day involuntary commitment order finding JA gravely disabled. JA argues that insufficient evidence supported the court's finding that JA was gravely disabled.

Following 90 days of involuntary commitment, the State petitioned the court for JA to be committed an additional 180 days. After a hearing, a superior court commissioner found JA gravely disabled because of JA's extensive behavioral health history, active psychosis, and minimal engagement with his treatment team during his commitment. The commissioner further found JA would be unable to get the essential care needed for his health or safety if released. JA moved for revision of the commissioner's ruling; the superior court judge denied JA's motion for revision.

We hold that sufficient evidence supports the superior court's finding of grave disability under RCW 71.05.020(1)(b). Accordingly, we affirm the superior court's denial of JA's motion for revision.

FACTS

In September 2023, following an order dismissing residential burglary and harassment charges due to JA's incompetency and directing a civil commitment evaluation, the State petitioned the superior court to commit JA for 180 days of involuntary treatment. JA stipulated to being gravely disabled because of a behavioral health disorder and agreed to be committed civilly for up to 90 days.

In early January 2024, toward the end of JA's 90-day commitment period, Dr. Vanessa Kieu, a licensed psychologist at Western State Hospital (WSH), petitioned to extend JA's involuntary commitment for an additional 180 days.

Dr. Kieu and JA testified at the 180-day petition hearing.

Dr. Kieu diagnosed JA with a schizophrenia spectrum disorder and a substance abuse disorder. In support of her diagnoses, Dr. Kieu reviewed the case discovery materials, WSH records, and the Office of Forensic Mental Health Service records; she also observed JA on the ward. Dr. Kieu noted JA's "very extensive mental health contact for major mental illness dating back to 2000 and -- at least to 2016. Available records indicate that he exhibit[ed] a wide range of psychiatric signs and symptom[s] during [a prior] time of psychiatric decompensation,[1] and those symptom[s] includ[ed] paranoia, delusional thought content, hallucination, irritable mood, also suicid[al] ideation." Clerk's Papers (CP) at 79.

---

[1] "Decompensation" is "the progressive deterioration of routine functioning supported by evidence of repeated or escalating loss of cognitive or volitional control of actions." *In re Det. of LaBelle*, 107 Wn.2d 196, 206, 728 P.2d 138 (1986).

Dr. Kieu also consulted with JA's treatment team and nursing staff. They shared with Dr. Kieu that, during JA's recent commitment period, JA exhibited possible paranoia and negative symptoms[2] of schizophrenia. Specifically, JA expressed "a concern that he's being poisoned [] to the point that his meals ha[d] to be placed on seal at some point during this current evaluation and treatment period. And he was also known to actually giv[e] away his food as well."[3] CP at 79. JA only engaged minimally with his treatment team and treatment groups.

In relation to cognitive control, "[JA] continue[d] to present with symptom that relate[d] to [his] specific mental health diagnosis . . . very similar to the available records and historical information which . . . [included] paranoia, delusional thought content, hallucination," and Dr. Kieu believed "those symptom[s] and sign[s] significantly impact[ed] his current functioning." CP at 83-84. Additionally, JA expressed negative symptoms of being "socially withdrawn . . . selectively mute, [exhibiting] a lack of emotional expression or diminished emotional expression." CP at 84. Dr. Kieu opined that JA's negative symptoms resulted from his behavioral health disorder.

Dr. Kieu noted that JA's volitional control[4] improved during the commitment period as he had not engaged in assaultive behavior toward himself or others and his emotional aggression

---

[2] A "negative symptom" is "a deficit in the ability to perform the normal functions of living." AM. PSYCH. ASS'N (APA) DICTIONARY OF PSYCHOLOGY, https://dictionary.apa.org/negative-symptom (last visited Apr. 8, 2025).

[3] By the time of the hearing, JA was no longer on a sealed meal order.

[4] "Volition" refers to how an "individual decides upon and commits to a particular course of action." APA DICTIONARY OF PSYCHOLOGY, https://dictionary.apa.org/volition (last visited Apr. 8, 2025).

3

and assaultive behavior symptoms decreased over time. Dr. Kieu believed JA's compliance with psychotropic medication likely caused improvement in his volitional control.

Dr. Kieu observed JA on the ward and attempted three direct contacts with JA but only successfully engaged with him once for about five minutes. At that contact, JA was largely nonverbal. However, JA expressed his wants and needs upon discharge. JA also acknowledged having auditory and visual hallucinations, but he declined to elaborate further and "said something to the [e]ffect of just because I hear voice[s] doesn't mean that I need to be here." CP at 78. Dr. Kieu believed JA may have minimized his hallucinations out of concern that he would remain committed involuntarily.

Although JA remained compliant with his medication, provided some insight related to his treatment needs, attended to his activities of daily living, and expressed his desire to be discharged to a housing program or to his mother's house, Dr. Kieu noted JA continued to hallucinate and did not have clear plans for shelter or a stable support system. And—while JA's four transfers within a month during his 90-day commitment could have significantly impacted the treatment relationship and made it difficult for JA to progress toward discharge—JA was at WSH for the majority of his treatment period, and he appeared neither engaged nor interested in working toward discharge. For example, JA's negative symptoms related to his schizophrenia prevented him from giving consent for the hospital to engage his mother in his treatment, despite repeated attempts by the treatment team to gain JA's consent.

Further, Dr. Kieu opined, if discharged and despite JA's representation that he would remain medication compliant, JA may not be able to make rational decisions regarding his treatment due to active symptoms of psychosis. JA's minimal engagement with the treatment

4

team raised concerns about JA's ability to access and use community resources. When asked whether Dr. Kieu believed JA would be able to procure food for himself upon release in the community, she responded, "In this shelter[ed] environment, there's concern that [JA]'s not even able to fully attend to his needs. I think part of it is because there is the paranoia piece and there's possibly delusion where he's concerned that his food may be poisoned in this type [of] environment." CP at 82. Dr. Kieu explained that JA's paranoia put him at risk of serious physical harm because he would not seek out food or eat food given to him if discharged into the community.

Dr. Kieu's ambivalence for less restrictive alternative (LRA) treatment stemmed from JA's continued lack of engagement with his treatment team, but she admitted the treatment team considered LRA.[5]

JA testified to the following: that upon discharge he would live with his mother and apply for a housing program in the community, that he had made an appointment for behavioral health treatment in the community, and that he would continue taking his medication upon release because it "makes me have a more level . . . set of mind, keeps me calm so I can be appropriate." CP at 98. JA explained his lack of engagement with his treatment team resulted from not having a stable environment after being moved between different facilities and within different wards of a facility.

The commissioner found by clear, cogent, and convincing evidence that JA continued to be gravely disabled. Additionally, the commissioner found that JA, "as a result of a behavioral health disorder manifest[ed] severe deterioration in routine functioning evidenced by repeated

---

[5] The State conceded JA was ready for LRAs at the end of the petition hearing.

and escalating loss of cognitive or volitional control over actions, [was] not receiving such care as [was] essential for health and safety." CP at 44. Further, the commissioner found LRA was in JA's best interest so long as JA engaged with the treatment team in conducting discharge planning. The commissioner committed JA for up to an additional 180 days.

JA sought revision of the commissioner's ruling, arguing the record contained insufficient evidence to support a finding of gravely disabled. The superior court denied JA's motion for revision.

JA appeals both the commissioner's order detaining JA for 180-day involuntary commitment and the superior court's denial of his motion for revision.

ANALYSIS

JA argues the State failed to prove by clear, cogent, and convincing evidence that JA is gravely disabled. Specifically, JA argues the superior court had no factual basis to conclude JA manifested severe deterioration in routine functioning—including recent proof of significant loss of cognitive control—and was not receiving, or would not receive after release, essential care for health and safety. Additionally, JA argues the State failed to prove that he would be unable to make rational decisions about treatment or meet his essential needs of health and safety as a result of his behavioral health disorder. We disagree.

A. *Legal Principles*

"Following a denial of a motion to revise a commissioner's ruling, we 'review the superior court's ruling, not the commissioner's decision.'" *In re Det. of A.M.*, 17 Wn. App. 2d 321, 330, 487 P.3d 531 (2021) (quoting *In re Det. of L.K.*, 14 Wn. App. 2d 542, 550, 471 P.3d

6

975 (2020)). And "[w]hen the superior court denies a motion to revise the commissioner's ruling, the commissioner's decision becomes the superior court's decision." *Id.*

In 90- and 180-day commitment proceedings, the State bears the burden of proof by presenting clear, cogent, and convincing evidence. RCW 71.05.310. Clear, cogent, and convincing evidence is met when the ultimate fact in issue is shown by evidence to be highly probable, or, in other words, the findings must be supported by substantial evidence in light of the highly probable test. *In re Det. of LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986); *A.M.*, 17 Wn. App. 2d at 330. Substantial evidence is the "'quantum of evidence sufficient to persuade a fair-minded person' that the premise is true." *Matter of A.M.*, 17 Wn. App. 2d at 330 (quoting *In re Det. of H.N.*, 188 Wn. App. 744, 762, 355 P.3d 294 (2015)). "[W]e 'will not disturb the trial court's findings of grave disability if [they are] supported by substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing." *In re Det. of D.W.*, 6 Wn. App. 2d 751, 757, 431 P.3d 1035 (2018) (quoting *LaBelle*, 107 Wn.2d at 209) (alteration in original) (internal quotation marks omitted). When evaluating the sufficiency of the evidence, we consider the evidence in the light most favorable to the petitioners. *A.M.*, 17 Wn. App. 2d at 330. Furthermore, we do not review a trial court's decisions on witness credibility or the persuasiveness of the evidence. *In re Det. of A.F.*, 20 Wn. App. 2d 115, 125, 498 P.3d 1006 (2021).

Generally, under RCW chapter 71.05, individuals may be committed involuntarily for behavioral health disorder treatment if, as a result of such disorder, they either (1) pose a substantial risk of harm to themselves, others, or the property of others, or (2) are gravely

disabled. RCW 71.05.280; *LaBelle,* 107 Wn.2d at 201-02. An individual is gravely disabled when, as a result of behavioral health disorder, the individual:

> (a) [i]s in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

RCW 71.05.020(25).[6]

To establish grave disability under prong (b), the State must show (1) "severe deterioration in routine functioning as evidenced by 'recent proof of significant loss of cognitive or volitional control,'" and (2) "'a factual basis for concluding that the individual is not receiving or would not receive, if released, such care as is essential for his or her health or safety.'" *A.M.*, 17 Wn. App. 2d at 335 (quoting *LaBelle*, 107 Wn.2d at 208). Implicit within gravely disabled's definition is a requirement that the individual is unable, because of the individual's severe deterioration of mental functioning, to make rational decisions with respect to their need for treatment. *LaBelle*, 107 Wn.2d at 208; *see also A.M.*, 17 Wn. App. 2d at 335.

The addition of prong (b) to RCW 71.05.280 represents the legislature's intent to permit "'intervention before a mentally ill person's condition reaches crisis proportions,' as it 'enables the State to provide the kind of continuous care and treatment that could break the [revolving door] cycle and restore the individual to satisfactory functioning.'" *A.M.*, 17 Wn. App. 2d at 335 (quoting *LaBelle*, 107 Wn.2d at 206). Prior to the addition of prong (b), chronically ill persons could not be treated involuntarily until they decompensated to the standard in prong (a), when

---

[6] We cite to the current version of the law here because the substance of this subsection has not changed between now and either the commissioner's or the superior court's consideration of the 180-day petition.

they were in danger of serious harm from an inability to care for themselves. *LaBelle*, 107 Wn.2d at 206. That created a revolving door syndrome, where patients "often move[d] from the hospital to dilapidated hotels or residences or even alleys, parks, vacant lots, and abandoned buildings, relapse, and [were] then rehospitalized, only to begin the cycle over again." *Id*. By incorporating the concept of decompensation into prong (b), it permitted the State to "treat involuntarily those discharged patients who, after a period of time in the community, drop out of therapy or stop taking their prescribed medication and exhibit 'rapid deterioration in their ability to function independently.'" *Id.* (quoting Durham & LaFond, *The Empirical Consequences and Policy Implications of Broadening the Statutory Criteria for Civil Commitment*, 3 Yale L. & Pol'y Rev. 395, 410 (1985)).

B.    *Substantial Evidence Supports the Superior Court's Finding of Grave Disability under RCW 71.05.020(25)(b)*

During his 90 day commitment period, JA acknowledged auditory and visual hallucinations. JA experienced food paranoia, and possible delusion, because JA believed his food may be poisoned. JA's treatment team noted JA gave away his food. Because of JA's food paranoia during the commitment period, doctors ordered WSH to serve JA's food sealed. Dr. Kieu testified JA's food paranoia put him at risk of serious physical harm because he may not eat food provided to him or seek out food when discharged into the community. Furthermore, Dr. Kieu opined JA's hallucinations and paranoia symptoms were caused by his behavioral health disorder. Therefore, while at the time of the hearing no sealed food order was in effect, JA's paranoia symptoms and need for the food order still qualified as recent proof of a significant loss of cognitive or volitional control. We conclude the record contains substantial evidence that

9

JA's behavioral health disorder caused recent repeated and significant loss of cognitive control, which the superior court could have reasonably found to be clear, cogent, and convincing.

Next, Dr. Kieu testified to numerous instances of JA's lack of engagement in treatment, which Dr. Kieu linked to a negative symptom of JA's behavioral health disorder. Dr. Kieu attempted interviewing JA three times. In their only meeting together, Dr. Kieu spoke with JA for only five minutes, and JA stated something to the effect of "just because I hear voice[s] doesn't mean that I need to be here," which caused Dr. Kieu to believe JA minimized his symptoms. CP at 78. While JA planned on living with his mother once discharged, JA still had not provided consent for his treatment team to engage with his mother despite repeated attempts by the treatment team to get his consent. According to Dr. Kieu, JA's lack of engagement towards his treatment team not only made it difficult to assess his needs but also caused great concern over JA's ability to meet his own needs essential to his health or treatment if discharged. This was particularly so because Dr. Kieu believed JA could not even attend to his own needs in the sheltered environment at WSH so he may not be able to make rational decisions regarding his treatment once in the community. While JA's behavioral health condition improved somewhat during this commitment period and JA understood the benefits of medication including his willingness to continue medication, we do not review the court's decisions on witness credibility or persuasiveness of the evidence. *A.F.*, 20 Wn. App. 2d at 125.

Furthermore, JA's current symptoms were consistent with his history of symptoms showing decompensation. JA had an extensive behavioral health history dating back to 2000, and, at least since 2016, JA had a history of decompensation. Despite JA's improvement in his current symptoms and his agreement to continue treatment after discharge, JA's symptoms

mirrored those symptoms he experienced during a prior period of decompensation. During that previous instance, JA exhibited paranoia, delusional thought content, hallucinations, an irritable mood, and suicidal ideation. During the current commitment period, JA also exhibited several of the same symptoms consistent with his historical symptoms. Based on the evidence, discharging JA when he was already experiencing several symptoms that he experienced during a prior decompensation period would have presented a significant risk of JA falling into the revolving door syndrome. We conclude the record contains substantial evidence that JA would not receive care essential to his health or safety in the community, which the superior court could have reasonably found to be clear, cogent, and convincing.

Lastly, JA argues the superior court erred because the court concluded commitment was in JA's best interest. We agree that involuntary commitment is not sufficiently justified if the involuntary commitment is supported only by a finding that it is in a person's best interest. *See LaBelle*, 107 Wn.2d at 208 ("It is not enough to show that care and treatment of an individual's mental illness would be preferred or beneficial or even in [their] best interests."). However, as discussed above, the record contained substantial evidence, separate from JA's best interests, to conclude JA was gravely disabled.

Accordingly, we hold that the evidence is sufficient to support the superior court's finding of grave disability under RCW 71.05.020(25)(b).

CONCLUSION

We affirm the superior court's denial of JA's motion to revise the 180-day commitment order.

11

No. 59371-8-II

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW

2.06.040, it is so ordered.

_Che, J._
Che, J.

We concur:

_Lee, J._

_Cruser, A.C.J._
Cruser, A.C.J.

12